Atkinson, J.,
delivered the opinion of the court:
This claim was referred to the court for findings of fact and conclusion of law, under the terms of the act of March 3, 1887 (24 Stats., 505), generally known as the Tucker Act. The claim is stated at $50,000 — $25,000 each for the loss of the steamers Grampus and Mohawk, owned by Thomas R. Chester and his two sons, Luster P. and Freeland Chester. Said vessels were captured by the Confederate authorities at Memphis, Term., May 25, 1861, and were used in the military service of the Confederate States Government until April 7, 1862, when they were scuttled and sunk by said Confederate authorities upon their evacuation of Island No. 10 in the Mississippi River. It appears that a bill for the relief of claimants was introduced in the Forty-eighth Congress, and later in the Fifty-first Congress, appropriating the sum of $12,000 in payment for said Grampus and $13,000 for said Mohawk, and $5,000 for the loss of a coal barge and its contents. Again, on March 5, 1910, another bill was introduced, which purports to appropriate $25,000 each for the loss of said two steamers, and $5,000 for the coal barge, making an aggregate sum of $55,000.
The material facts in this case are briefly stated as follows : On April 17,1861, claimants cleared the port of Pittsburgh, Pa., with said steamers, having in tow eight barges loaded with coal belonging to them, destined for Louisville, Ky., and New Orleans, La. They arrived at Louisville on or about April 25, six days after the proclamation of President Lincoln blockading the ports along the Mississippi River in the States then engaged in insurrection against *366 the United States. Claimants nevertheless proceeded with their steamers and barges down the Ohio and Mississippi Rivers, and were permitted to reach New Orleans, La., where the coal was disposed of, and they were allowed to leave said port in an effort to return to Pittsburgh, Pa. On arriving at Memphis, on the return trip, their said vessels were captured by the Confederate authorities at that place and also a barge load of coal which had been left at said city as the steamboats were on their way to New Orleans. Said steamboats were thereafter promptly armed by the Confederate authorities, and were employed by them for about a year in belligerent operations along the Mississippi River until the capture of Island No. 10 by Federal troops, when they were scuttled and sunk, as above stated, by Confederate authority.
'It is shown by the findings that Thomas R. Chester and his son, Luster P. Chester, discovered their said steamers after they had been sunk, and asked permission of Commodore Foote, who was in command of the Federal forces at Island No. 10, to permit them to raise and repair their said vessels, which request was declined. It is now claimed that the refusal of Commodore Foote to permit the raising of said vessels resulted in the complete destruction of them by high water, which shortly thereafter descended the Mississippi Yalley.
The only question necessary to be discussed in the consideration of the evidence in this case is the effect of the refusal of Commodore Foote to permit the claimants to raise the vessels in question immediately after their capture. Without conceding that the title to them was in the claimants, it was unquestionably the right of the Government authorities to take a reasonable time to determine that question before relinquishing their possession, and as the findings show that they were carried away by the floods within a few days after their capture, no such reasonable time had elapsed before their destruction.
Another circumstance forcibly affecting the equities of this claim is the fact that the claimants took the boats into Confederate territory after the issuance of the President’s proclamation declaring it to be hostile territory, and of *367 which they had constructive, and doubtless actual, notice. The fact remains that they were voluntarily trading in hostile territory. This conduct on their part resulted in the destruction of their property in the manner stated.
We see nothing in the case indicating any misconduct on the part of the Government officer relating to this unfortunate affair, and hence do not think the claim is an equitable one against the United States, and certainly it never was a legal one.
It is ordered by the court that the findings herein, together with a copy of this opinion, be certified to the Congress.